UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | 2:22-CR-00008-DCLC-CRW |
| v. | ) | |
| | ) | |
| JATALLY WILLIAMS, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant filed a Motion to Suppress [Doc. 15]. The United States of America ("the Government") responded [Doc. 21], and the Court held a hearing on July 26, 2023. The Court makes the following factual findings and conclusions of law.

**I.     FACTUAL FINDINGS**

At the evidentiary hearing, the Government called investigator William Saulsbury. Investigator Saulsbury testified that law enforcement had received confidential and reliable information that narcotics were being sold out of 1740 Nathaniel Drive, Apt. 23, in Johnson City, Tennessee. On February 4, 2022, he was surveilling that address when he saw a black Nissan Rogue with New York tags pull into the apartment complex. He then observed another individual exit the apartment, walk over to the vehicle and place what appeared to be a piece of luggage in the vehicle's trunk and then return to the apartment. He saw the front passenger (later determined to be Defendant) exit the vehicle and enter the apartment where he remained for about ten minutes. Investigator Saulsbury observed Defendant then return to the vehicle which left the apartment parking lot. Investigator Saulsbury followed close behind. The vehicle made its way onto West

1

Market Street, where according to Investigator Saulsbury the speed limit was 35 m.p.h. Once onto West Market Street, Investigator Saulsbury paced the vehicle going 44 m.p.h., nine miles over the speed limit, as the vehicle passed Old Kiwanis Park.[1]

Investigator Saulsbury continued to follow the vehicle onto John Exum Parkway and notified dispatch he intended to stop the vehicle. The speed limit at this point on John Exum Parkway was 40 m.p.h. Even on John Exum Parkway, Investigator Saulsbury testified that the vehicle continued to exceed the posted speed limit. Here, he claimed he reached 47 m.p.h. as he kept pace with the vehicle. His body cam footage confirmed it.[2] Investigator Saulsbury testified that he activated his lights and siren to stop the vehicle. The vehicle did not stop but continued down John Exum Parkway until it became North Roan Street. At the intersection of North Roan Street and Mockingbird Lane, the vehicle tuned into the left turning lane behind two other vehicles, waiting for the light to change. At this point, when the vehicle had stopped for the red light, officers exited their patrol cars, and with guns drawn, surrounded the vehicle. Investigator Saulsbury approached the driver's side and ordered the driver out of the vehicle. He then instructed Defendant, who was in the front passenger seat, to keep his hands up in the air and to exit the vehicle. Once Defendant had exited, another officer handcuffed him and began walking him to the rear of the vehicle. Within a minute after taking Defendant out of the vehicle, the officer asked him "Is there anything on you that is going to poke, stick or cut me?" In response,

---

[1] Investigator Saulsbury testified he knew the vehicle was traveling at that speed because he "paced" it by following behind it, matching its speed, and noting the reading of his own speedometer. Saulsbury testified he had received training in 2014 on pacing a vehicle to determine its speed. He also testified that in his car there was a card that indicated his vehicle had been properly calibrated before it was assigned to him.

[2] Investigator Saulsbury noted he turned off his body camera just before activating his lights, so it did not capture the minute-long pursuit.

2

Defendant said, "There is…I got a gun." The officer said, "What? … You gotta gun?" Defendant shook his head affirmatively and said "yes." The officer thanked Defendant for telling him. At that point, the officer patted down Defendant and lifted Defendant's shirt to discover a firearm concealed under Defendant's shirt in his waistband. The officer removed the firearm and handed it to another officer while he continued to search Defendant's person. The officer then reached in Defendant's right coat pocket and removed over $10,000 in cash.

Investigator Saulsbury's body cam footage showed him remove a backpack from the vehicle and take out another opaque bag from inside the backpack. He then opened that bag and discovered what turned out to be over 500 grams of methamphetamine and 60 grams of heroin. Officers moved the vehicle from the four-lane road to a nearby parking lot and performed a canine sniff. The canine alerted, so officers searched the trunk and found several guns in a duffel bag.

Defendant filed the present motion seeking to suppress the gun retrieved from his waistband, the cash from his pocket, the drugs in the backpack, and the guns in the trunk [Doc. 15, pg. 1]. In its response, the Government conceded the suppression issue concerning "the search of the backpack … as well as the firearms discovered from the trunk of the vehicle." [Doc. 21, pg. 1 n. 1]. At the hearing, the Government also stated that it did not intend to introduce in its case in chief evidence of the more than $10,000 in cash the officer removed from Defendant's coat pocket. It agreed that it would not seek to admit in its case in chief any of the drug evidence located in the backpack or the firearms discovered in the trunk. [*Id.*] Thus, the only issue left for the Court to decide is whether the search of Defendant that resulted in the discovery of the firearm concealed under his shirt was in violation of the Fourth Amendment.

II. **CONCLUSIONS OF LAW**

The Fourth Amendment protects "the right of the people to be secure in their persons,

3

houses, papers, and effects[] against unreasonable searches and seizures." U.S. Const. amend. IV. In this case, Defendant claims that officers violated the Fourth Amendment when they made the initial traffic stop and when the officer pulled up Defendant's shirt to discover the concealed firearm.

Police may initiate a traffic stop if they have (1) probable cause to believe that the driver committed a civil traffic infraction or (2) reasonable suspicion that criminal activity is ongoing. *United States v. Collazo*, 818 F.3d 247, 253–54 (6th Cir. 2016) (citing *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)). "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourteenth Amendment." *United States v. Bradshaw,* 102 F.3d 204, 210 (6th Cir. 1996).

In this case, Investigator Saulsbury testified that he paced the vehicle near Old Kiwanis Park going nine miles over the posted speed limit. He also testified that the vehicle was speeding further down the road when it was traveling 47 m.p.h in a 40 m.p.h zone. Driving over the speed limit is a traffic violation in Tennessee. *See* Tenn. Code Ann. § 55-8-152 (making it unlawful to drive a motor vehicle in excess of the posted speed limit). A traffic stop is not in violation of the Fourth Amendment where an officer has probable cause to believe the vehicle exceeded the posted speed limit. *United States v. Wellman*, 185 F.3d 651, 655–56 (6th Cir. 1999) ("Because the officer had probable cause to believe that a traffic law had been violated, the initial stop of the vehicle was valid.").

Defendant contends that the investigator lacked probable cause because he simply paced the vehicle's speed and did not use a radar. But in *United States v. Carter*, 662 F. App'x 342, 346-47 (6th Cir. 2016), the Sixth Circuit found that district court did not err in determining that Carter had been speeding based on the officer pacing Carter's car. In other words, pacing is an acceptable

4

means that will support a probable cause finding that a vehicle was violating civil traffic laws. Other courts have similarly held that pacing will support probable cause for a traffic stop. *See, e.g.*, *United States v. Whaley*, No. 1:04-CR-122, 2005 WL 8168971, at *2 (E.D. Tenn. Jan. 11, 2005) (holding officer had probable cause to stop a car paced at 60 miles per hour in a 45 mile-per-hour zone where the speedometer "was occasionally checked with radar"); *United States v. O'Kelley*, No. 1:14-CR-73, 2014 WL 5438521, at *2 (E.D. Tenn. Oct. 24, 2014) (declining to suppress evidence from traffic stop based on officer's pacing of a speeding vehicle where officer's car had been calibrated when it was new and driven 50,000 miles).

Defendant also contends that the proof was insufficient that Investigator Saulsbury's vehicle had been calibrated. At the hearing, however, Investigator Saulsbury testified that while the vehicle had not been calibrated since it had been assigned to him, it had a card on the visor that indicated the vehicle had previously been calibrated. He also testified that vehicles are only calibrated once and that, in his experience, is standard. There was no other proof that either the calibration was inaccurate, that it had never been done, or that one calibration is insufficient. The Court credits Investigator Saulsbury's testimony in this regard.

Defendant also argues the Court should not find Investigator Saulsbury credible because he turned off his body camera during the pursuit. It is true the investigator turned off his body camera. But when he turned it back on, it showed his vehicle traveling 47 miles per hour in a 40 mile-per-hour zone. Defendant offers no evidence to controvert Investigator Saulsbury's testimony or otherwise dispute what is clear on the body cam footage. Moreover, the Court finds Investigator Saulsbury's testimony credible that he paced the vehicle exceeding the speed limit by nine miles an hour near the Old Kiwanis Park. Thus, probable cause supported the initial stop.

5

Defendant next challenges officers' decision to remove him from the vehicle. But there is no authority that suggests officers cannot remove occupants from a vehicle during a traffic stop. In fact, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111, n. 6 (1977); *see also United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016) (citing *Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997)) (explaining that "during a traffic stop, an officer may order passengers out of the vehicle pending the completion of the stop," and no "independent justification to remove the driver or passengers from the vehicle" is necessary).

Defendant argues that officers should not have handcuffed him when they did. There are limits to the use of handcuffs in these situations. But "the use of handcuffs [does not] exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution." *Houston v. Does*, 174 F.3d 809, 815 (6th Cir. 1999). Here, officers had previously observed Defendant stay for only ten minutes in an apartment officers had reason to believe was connected with drug trafficking, and, in Investigator Saulsbury's experience, the placing of a bag in the trunk of the car and Defendant entering the apartment and only staying for 10 minutes was indicative of drug trafficking. Combining those facts with the vehicle not initially stopping when Investigator Saulsbury had activated his lights and siren warranted the immediate precautions the officers took that evening. Further, an officer handcuffed Defendant immediately upon Defendant's exit from the vehicle and then within seconds asked if he had anything on him that could "poke, stick or cut me." Defendant said he had a gun. It was at this point that the officer patted down Defendant, raised Defendant's shirt and discovered the firearm concealed in Defendant's waistband. Officers may conduct a pat-down search for weapons under *Terry v. Ohio*, 392 U.S. 1 (1968) when they

6

have "reasonable suspicion that the person searched may be armed and dangerous." *Pacheco*, 841 F.3d at 390 (quoting *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)). Such suspicion was here in spades because Defendant admitted he had a gun on his person. It would have been a dereliction of the officer's responsibility to ignore that and let Defendant remain armed during the pendency of the traffic stop. Thus, for these reasons, the search for the firearm under Defendant's shirt was not in violation of the Fourth Amendment.

## III.   CONCLUSION

For the reasons stated above, Defendant's motion [Doc. 15] is **DENIED** as to the gun recovered from under Defendant's shirt and concealed in his waistband. Because the Government announced that it will not introduce in its case in chief the more than $10,000 in cash discovered in Defendant's coat pocket, the drugs discovered in the bags taken from the backpack, and the guns discovered upon a search of the vehicle's trunk, Defendant's motion to suppress those items is **DENIED AS MOOT.**

SO ORDERED:

s/ Clifton L. Corker
United States District Judge